878 A.2d 670

John C. BENNETT

v.

Kara ZELINSKY.

No. 1246, Sept. Term, 2004.

Court of Special Appeals of Maryland.

July 12, 2005.

 

M. Evelyn Spurgin (Samuel J. Brown, Hillman, Brown & Darrow, PA, on brief), Annapolis, for appellant.

Charles R. Schaller (Carl N. Zacarias, Schaller & Gorski, LLOP, on brief), Annapolis, for appellee.

Panel ADKINS, SHARER, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

SHARER, J.

In this appeal from the Circuit Court for Anne Arundel County, we are asked to review a decision of the City of Annapolis Board of Appeals ("the Board") relating to the definition of "front lot line."

In sound bite form, the history of this litigation is: Appellant, John C. Bennett, made application for a building permit; the permit was approved by the City Planning Director; the Board overruled the Planning Director; the circuit court reversed the Board; Kara Zelinsky,[1] the current appellee,

---

1. Appellee's maiden name, Gontkovic, appears in the earlier part of the record. We will refer to her by her married name, Zelinsky.

appealed to this Court, which reversed (on grounds not involving the merits) and remanded; the circuit court, on the same evidence, affirmed the Board; and appellant has noted this appeal.

### FACTUAL and PROCEDURAL HISTORY

Appellant is the owner of the property located at 5 Silopanna[2] Road in Annapolis, Maryland ("the Bennett Property"). Appellant's property is characterized as a "flag lot," defined by the Board of Appeals as a lot with a narrow width (the flag pole), bordering a street, which widens at the rear (the flag). The "flag" portion of the lot is then behind another lot, the full width of which borders on the same street. The "pole" portion of the lot, because of side yard requirements, cannot be built upon. The portion of the Bennett Property that can be built upon (the "flag") is located behind 7 Silopanna Road, the lot owned by appellee ("the Zelinsky Property").

The dispute originated in May 2002, when Bennett applied for a building permit to demolish a one-story structure on the "flag" portion of his property and to build in its place, on the same "footprint," a two story house.[3] Zelinsky opposed the issuance of the permit, because a new house on the same footprint would be uncomfortably close to her house. The issue faced by the Director of Zoning and Planning was determination of the "front lot line" to accommodate the building setback requirements.[4]

---

2. At oral argument we were instructed by counsel, possessed of local knowledge, that "Silopanna" is "Annapolis" spelled backward.

3. The record reveals that the existing structure was blighted and that the local government had taken measures to have it removed.

4. As defined in the Annapolis City Code, § 21.04.405, "front lot line means that boundary of a lot which is along an existing or dedicated public street." Silopana Road is a dedicated, existing public street. The Bennett Property is located in an R2 zone, which imposes a 25 foot setback; a six foot interior side yards; and a 30 foot rear yard. The minimum lot width in an R2 zone is 50 feet.

On September 3, 2002, Jon Arason, Planning Director of the Department of Planning and Zoning, recommended to the Board that the permit be granted. It was his interpretation of the zoning code that the front lot line of the Bennett Property consisted of that portion of the property that actually abuts Silopanna Road at the bottom end of the "pole." [5]

In his report to the Board, the Director stated:

Flag lots, that is lots that have a narrow width accessing a street that widens at the rear, can be problematic when they develop since they are always behind another lot, meaning that the front of the house on a flag lot abuts and faces the rear of the house on the lot in front. Subject property is especially problematic to [Zelinsky] because the six foot side yard places the house to be constructed very close to [Zelinsky's] back yard.

In reviewing the plans for 5 Silopanna, staff took into consideration the location of the existing structure which was being expanded, but to a greater extent the precedent that has been established in determining yards on flag and other oddly shaped lots.

On the basis of the Director's recommendation, the permit was approved.

Zelinsky appealed the Director's decision with respect to, *inter alia*, the determination of the front lot line. On September 3, 2002, a hearing was held before the Board of Appeals. The Director again explained the reasoning behind his initial recommendation:

Now, the basis of my determination about the yards, if you look at the City Code, they define a front lot line, Section 21.04.405 as a boundary of a lot that's along an existing or dedicated public street. That's pretty easy to determine here along the street. 21.04.410 defines a rear lot line as the boundary of a lot that is more distant from or most nearly parallel to the front lot line. And I think that that's very obvious on this particular lot as well, what is the rear.

---

**5.** The "pole" portion of Bennett's lot has ten feet of frontage on Silopanna Road and extends to a depth of 90 feet before widening.

> And then in a—one of the few instances of plain language in our entire Code, it defines a side lot line as any boundary that's not a front or rear lot line. And that was really the basis of my determination what constitutes the lot—

The Board of Appeals issued an opinion on November 7, 2002, reversing the decision of the Director.[6]

Bennett sought judicial review in the Circuit Court for Anne Arundel County on November 22, 2002, raising several issues in addition to the determination of the lot lines.[7] Following argument on the record, the circuit court issued its opinion on May 20, 2003.

Addressing each of the issues raised by Bennett, the circuit court reversed the Board's ruling on the front lot line question; ruled that Zelinsky's failure to attend the hearing was fatal to her opposition; and found the final issue to be moot. Specifically, on the issue of flag lots, the circuit court held that the Board's determination of the front lot line, absent any differentiation in the Code with regard to flag lots and other traditional lots, was arbitrary and capricious. On the question of Zelinsky's failure to appear, the circuit court found that, while Zelinsky attempted to create an agency relationship between herself and her then-husband, Keith Zelinsky, the Code did not provide for that type of representation at an administrative hearing. Thus, the court remanded the matter with directions to dismiss Zelinsky's appeal. Finally, the court declined to reach the third issue involving transcripts, on mootness grounds.

Zelinsky appealed to this Court, and in an unreported opinion, we remanded the case to the circuit court. We found that Zelinsky, as a party to the administrative proceeding, was

---

6. Because we review the decision of the Board, not the circuit court, we shall discuss the Board's reasoning in greater detail, *infra.*

7. Bennett also raised the following issues: (1) whether the appeal should have been dismissed because Zelinsky failed to appear; and (2) whether the opinion of the Board of Appeals should be reversed due to the fact that the Board failed to make a transcript showing the vote of each member.

denied due process because she had not been provided notice of the hearing. Because we reversed on procedural grounds, we did not address the merits.[8]

On remand, with all parties and counsel present, the circuit court conducted another hearing on the administrative record. Following that hearing, the circuit court affirmed the Board's reversal of the Director's decision.

Bennett noted this timely appeal, raising for our review two questions, which, as rephrased, are:[9]

    I.    Did the Board of Appeals err in reversing the decision of the Director of Planning and Zoning?

    II.    Did the Board of Appeals and circuit court apply the correct standard of review to the decision of the Director of Planning and Zoning?

Because we answer question I in the affirmative, we need not reach question II.[10] We shall reverse the decision of the circuit court and the Board of Appeals.

## DISCUSSION

### I.  Did the Board of Appeals err in reversing the decision of the Director of Planning and Zoning?

#### Contentions of the Parties

Appellant argues that the clear and unambiguous definition of "front lot line" in the Annapolis City Code compels the

---

8. *Zelinsky v. City of Annapolis Board of Appeals*, No. 763, Sept. Term 2003, 156 Md.App. 749 (March 12, 2004).

9. Appellant's original questions presented were:
    I.    Did the Board of Appeals and the Circuit Court err by not finding as a matter of law that the Director of Planning and Zoning's interpretation of the Annapolis City Code was correct?
    II.    Assuming, *arguendo*, that the question of the location of the front lot line is a mixed question of law and fact, did the Circuit Court err when they reversed the Director of Planning and Zoning because they applied the wrong standard of review and the Director of Planning and Zoning's decision was not arbitrary and capricious?

10. The determination of the front lot line is a question of law. We do not find the determination before the Board to have been a mixed question of law and fact.

conclusion that the Planning Director's interpretation was correct, and that the Board of Appeals and the circuit court erred. In overruling the Planning Director, according to appellant, the Board "created a new definition for front lot lines on flag lots, when no such definition exists in the code."

Appellee takes the position that the Board of Appeals is vested with the authority to administer the Code, pointing specifically to Section 21.90.030(B) of the code, which provides that the Board may "affirm or reverse ... or may modify the order ... decision or determination or the board may issue a new ... decision ... *To that end, the Board has all the powers of the officer from whom the appeal is taken."* (Emphasis in original.)

■ The public policy underlying Maryland's zoning law includes the promotion of "the health, safety, and general welfare of the public, and the Act vests in the counties [and municipalities] the full measure of power which the State could exercise in pursuit of this objective." *Mayor & Council of Rockville v. Rylyns Enters., Inc.,* 372 Md. 514, 531, 814 A.2d 469 (2002) (quoting *In re Harbor Island Marina, Inc. v. Bd. of County Comm'rs of Calvert County,* 286 Md. 303, 312–13, 407 A.2d 738 (1979) (internal citation omitted)). The motives and reasoning of the legislative body, in the adoption of an original or comprehensive zoning, are entitled to a strong presumption of correctness and validity. *Id.* at 535–36, 814 A.2d 469.

■ A reviewing court cannot substitute its judgment for that of the zoning agency and must affirm "any decision which is supported by substantial evidence and therefore fairly debatable." *Richmarr Holly Hills, Inc. v. American PCS, L.P.,* 117 Md.App. at 607, 639, 701 A.2d 879 (1997).

In *Prince George's County v. Meininger [Meininger],* 264 Md. 148, 152, 285 A.2d 649, 651 (1972), it was explained that "substantial evidence" means a little more than a "scintilla of evidence," and in *Eger v. Stone,* 253 Md. 533, 542, 253 A.2d 372, 377 (1969), the "fairly debatable" standard was defined as follows:

> We have made it quite clear that if the issue before the administrative body is "fairly debatable," that is, that its determination involved testimony from which a reasonable man could come to different conclusions, the courts will not substitute their judgment for that of the administrative body....

Courts in Maryland tend to defer to zoning agencies because of their presumed "expertise," and because it is thought best to allow the agency, rather than the reviewing court, to exercise the "discretion" to grant or deny an application.

*Richmarr, supra,* 117 Md.App. at 639–40, 701 A.2d 879.

▮ Upon reviewing an agency's conclusions of law, our review is expansive, and we owe no deference. *Harford County People's Counsel v. Bel Air Realty,* 148 Md.App. 244, 259, 811 A.2d 828 (2002) (citing *Harford County, Maryland v. McDonough,* 74 Md.App. 119, 122, 536 A.2d 724 (1988) quoting *Gray v. Anne Arundel County,* 73 Md.App. 301, 309, 533 A.2d 1325 (1987)). Nonetheless, "the administrator's expertise should be taken into consideration and its decision should be afforded appropriate deference in our analysis of whether it was 'premised upon an erroneous conclusion of law.'" *Id.* at 259–60, 811 A.2d 828 (citations omitted).

In its interpretation of the relevant provisions of the Annapolis City Code, the Board stated:

> The unusual shape of this lot, and all flag lots, makes application of these definitions[11] difficult. The Director

---

11. The Board was referring to the following definitions in the City of Annapolis Zoning Code which relate to the determination of lot lines:

Sections 21.04.405, 410 and 415 define lot lines as the front lot line is "that boundary of a lot which is along an existing or dedicated public street"; the rear lot line is "that boundary of a lot which is most distant from or is most nearly parallel to the front lot line"; a side lot line is "any boundary of a lot that is not a front or rear lot line." Sections 21.04.650, 21.04.655, and 21.04.660 define lot yards as: a front yard is "the full length of the front lot line between the side lot lines"; a side yard is "a yard extending along a side yard lot line

took a very narrow approach to defining the front lot line as only the very narrow piece of property abutting the street at the end of the narrow access. However, taking into consideration the unique nature of flag lots and the definitions of lot lines and yards, the Board finds that for this Property, *the front lot line is the property line that starts at the end of the narrow access and which runs parallel with Silopanna Road.*

First, a legal lot in the R2 district must be 50 feet wide. The narrow access is only 10 feet wide. Nothing could be legally built on that portion of the lot save for a driveway, as it is clear that the sole reason for that strip is for access to the main part of the lot. Therefore, the front lot line of a flag lot must be the lot line which creates a legally conforming lot and which runs along, or parallel to, the public street.

Second, if the narrow definition of the front lot line is used, it is impossible to place the rest of the lines and the yards. Are all the other lot lines, including the sides of the narrow access, the two portions that run parallel to Silopanna, and the other lines which are not the rear line all the side lot lines? Similarly for the yards, the side yard extends from the front yard to the rear yard. If this small access way is the front line and therefore creates the front yard, where does the side yard begin? On the contrary, if the front lot line is established as determined here, the yards can easily be established.

Third, the purpose of the setbacks is to keep buildings at a distance to each other and to maintain orderly development. Rear setbacks in the R2 zone require 30 feet, so that if two

---

from the front yard to the rear yard," and a rear yard as "a yard extending along the full length of the rear lot line between the side lot lines."

Section 21.18.040 provides that for each permitted principal use located in the R2 district, "a front yard, two side yards and a rear yard shall be provided . . ."

Further, "side yard" is defined as "a yard extending along a side lot line from the front yard to the rear yard."

properties abut in the rear, they would have 60 feet between the main structures. The Director's interpretation of the front lot line for this Property would permit a building on a flag lot to be as little as 6 feet off a rear or side lot line of an adjacent parcel because the portion of the flag lot that is not the tiny front access or the rear would have to be a side yard with a six foot setback. This clearly is contrary to the purpose of the Code.

(Emphasis added.)

In *Harford County People's Counsel v. Bel Air Realty, supra,* Judge Thieme, facing an issue of interpretation apposite to that here presented, observed that "[t]his matter highlights the tension between the rule of law and the nebulous concept of an agency's discretion to implement the goals a statute was meant to achieve." *Id.* at 248, 811 A.2d 828. At issue in that case was whether a statutory mandate of "directly accessible" could be satisfied by a parcel being merely "accessible" to a highway.

Bel Air Realty owned a parcel of land near the intersection of Business U.S. Route 1, known as Conowingo Road, and the U.S. Route 1 "Bel Air" bypass. *Id.* The parcel was adjacent to the "Hickory Overlook" subdivision, and both properties were originally zoned "ORI" (Office, Research, Industrial).

In April 1995, both projects were reclassified from "ORI" to "R–3" (residential) by a zoning hearing examiner. *Id.* at 248–49, 811 A.2d 828. Intending to develop the parcel, Bel Air Realty arranged with the developer of Hickory Overlook to use a main road in the latter subdivision, Overlook Way, as access to Business Route 1. *Id.* at 249, 811 A.2d 828. Although the northern boundary of Bel Air Realty's parcel abutted the Route 1 Bypass, frontage access to this highway was denied by Maryland State Highway Administration regulations. *Id.*

With that agreement in hand, Bel Air Realty sought approval from the Harford County Department of Planning and Zoning to develop its property as a "conventional with open space (COS)" subdivision under the Harford County Zoning

Code. That designation would enable it to develop the Property at a greater density than that permitted for conventional R–3 development alone. *Id.* (Footnote omitted.) Bel Air requested that the Department provide an "interpretation" that its project satisfied the prerequisites for COS approval; that is, that the Property would be considered "directly accessible" to Business Route 1 for purposes of satisfying the access requirement. *Id.* at 250, 811 A.2d 828.

The question came before a Harford County zoning hearing examiner who, after conducting a hearing, concluded that the project was not "directly accessible" to Business Route 1, thus would not qualify for development with COS status. The Harford County Council, acting as the Board of Appeals, ratified and adopted the hearing examiner's decision in all respects. On judicial review, however, the circuit court reversed the Board's decision and remanded, ruling that "the Zoning Hearing Examiner's legal conclusion as to the meaning of the term directly accessible was in error." The court concluded that Bel Air Realty's parcel was "directly accessible to Route 1 over a public road." *Id.* at 257, 811 A.2d 828.

This Court reversed, finding no merit in Bel Air Realty's argument that because its parcel met the definition of accessible, that is, there was a means of ingress and egress, it, perforce, met the requirement of being "directly accessible" to Route 1. We held that to accept Bel Air Realty's interpretation would be to require the Board to read the term "directly" out of the Zoning Code. *Id.* at 266, 811 A.2d 828. We noted:

> We are mindful that "zoning ordinances are in derogation of the common law and should be strictly construed." *Gino's of Maryland, Inc. v. City of Baltimore,* 250 Md. 621, 642, 244 A.2d 218, 230 (1968), cited with approval in *White v. North,* 356 Md. 31, 48, 736 A.2d 1072, 1082 (1999). But when the language of the statute is clear, a tribunal, in this case the Board, "may neither add nor delete language, so as to 'reflect an intent not evidenced in that language.' " *Chesapeake and Potomac Telephone Co. of Maryland v. Director of Finance,* 343 Md. 567, 579, 683 A.2d 512, 518 (1996)

(quoting *Condon v. State*, 332 Md. 481, 491, 632 A.2d 753, 755 (1993)).

*Id.* at 266, 811 A.2d 828.

■ We find our decision in *Harford County* to be dispositive of the case *sub judice.* Section 21.04.405 of the City of Annapolis Zoning Code provides: " 'Front lot line' means that boundary of a lot which is along an existing or dedicated public street." Appellee concedes, as she must, that "flag lots" are not defined in the Code. But, she argues, given the unique nature of flag lots, the strict interpretation of the front lot line leads to the "undesirable and absurd result that Appellant's structure would sit a mere six (6) feet from [her] rear property line."

Appellee invites us to apply decisions from the courts of our sister states that deal with zoning application to irregularly shaped lots. *See, e.g., Higgs v. Kirkbride*, 258 Va. 567, 522 S.E.2d 861 (1999) (determining whether a particular lot, lacking symmetry, was irregularly shaped as contemplated by the zoning code); *Bianco v. City Engr. & Bldg. Inspector of North Adams*, 284 Mass. 20, 187 N.E. 101 (1933) (determination of lot lines requires the exercise of sound judgment); *McInerney Bldg. Inspector v. McInerney*, 47 Wyo. 258, 34 P.2d 35 (1934) (recognizing that irregularly shaped lots present problems with respect to set back and side yard requirements). We decline appellee's invitation for the reasons that (1) the cases are sufficiently factually distinguishable so that they are of little aid to our inquiry, and (2) we believe the Annapolis City Code to be unambiguous in its definition of "front lot line."

In *Marriott Employees Fed. Credit Union v. Motor Vehicle Administration*, 346 Md. 437, 697 A.2d 455 (1997), the Court of Appeals set forth guidance for our review of administrative interpretations:

The consistent and long-standing construction given a statute by the agency charged with administering it is entitled to great deference, *Balto. Gas & Elec. v. Public Serv. Comm'n*, 305 Md. 145, 161–62, 501 A.2d 1307, 1315 (1986), as the agency is likely to have expertise and practical experi-

ence with the statute's subject matter. *See, e.g., Sinai Hosp. v. Dept. of Employment,* 309 Md. 28, 46, 522 A.2d 382, 391 (1987); 2B N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 49.05, at 17 (5th ed.1993). The weight given an agency's construction of a statute depends on several factors—the duration and consistency of the administrative practice, the degree to which the agency's construction was made known to the public, and the degree to which the Legislature was aware of the administrative construction when it reenacted the relevant statutory language. *Magan v. Medical Mutual,* 331 Md. 535, 546, 629 A.2d 626, 632 (1993). Other important considerations include "the extent to which the agency engaged in a process of reasoned elaboration in formulating its interpretation" and "the nature of the process through which the agency arrived at its interpretation," with greater weight placed on those agency interpretations that are the product of adversarial proceedings or formal rules promulgation. *Balto. Gas & Elec.,* 305 Md. at 161–62, 501 A.2d at 1315.

*Marriott Employees,* 346 Md. at 445–46, 697 A.2d 455.

Additionally, the cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature. *Bowen v. Smith,* 342 Md. 449, 454, 677 A.2d 81 (1996) (citing *Shah v. Howard County,* 337 Md. 248, 254, 653 A.2d 425 (1995)). The principal source for determination of legislative intent is the language of the statute itself. *Lovellette v. Mayor & City Council of Baltimore,* 297 Md. 271, 282, 465 A.2d 1141 (1983). If the statutory language is clear and unambiguous, we need not look beyond the language to determine legislative intent. *Marriott Employees Fed. Credit Union, supra* (citing *Kaczorowski v. Mayor & City Council of Baltimore,* 309 Md. 505, 515, 525 A.2d 628 (1987)). If a statute is ambiguous, or susceptible to more than one meaning, "courts must consider not only the literal or usual meaning of the words but also the meaning of the words in light of the statute as a whole and within the context of the objectives and purposes of the enactment." *Marriott Employees Fed. Credit Union, supra,*

346 Md. at 445, 697 A.2d 455 (citing *Romm v. Flax,* 340 Md. 690, 693, 668 A.2d 1 (1995)).

The words of the Annapolis City Code are clear and unambiguous. The Board criticized the Director for applying a narrow definition of "front lot line." The definition is, in fact, a narrow one and, while the Board has "all the powers of the officer from whom the appeal is taken," the Board does not have the power to expand the statutory definition. The Board's use of other definitions in the Code to justify its reasoning is somewhat compelling, but it does not mesh with the unambiguous language of the Code in its definition of front lot line. To accept the Board's view would be to read an exception for "flag lots" into the Code that simply does not exist. The Board's interpretation effectively rewrites the front lot line definition to create an exception for flag lots. As the trial court in *Harford County* read out of the statute the word "directly," the Board here read into the Code the word "parallel."

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; CASE REMANDED WITH INSTRUCTIONS TO REVERSE THE DECISION OF THE BOARD OF APPEALS; COSTS TO BE PAID BY APPELLEE.**